IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SHEILA EICHELBERGER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. L-08-77 |
| | : | |
| SINCLAIR BROADCASTING | : | |
| GROUP, INC. , *et al.*, | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

Plaintiff Sheila Eichelberger brings this action alleging employment discrimination,

breach of contract, and other related torts against Defendants Sinclair Broadcasting Group, Inc.,

Paul Nesterovsky, and Jamie Dembeck.  Now pending is Defendants' Motion for Summary

Judgment.  The parties have fully briefed the motion, and an in-court hearing was held on June

30, 2009.  For the reasons stated herein, the Court will, by separate Order, GRANT the motion,

in part, and reserve ruling as to Count VI of the Second Amended Complaint.

I.      BACKGROUND

Sheila Eichelberger ("Ms. Eichelberger") began working as a Tax Provision Supervisor at

Sinclair Broadcasting Group, Inc. ("Sinclair") on December 5, 2005.  For several months prior to

accepting the position, Ms. Eichelberger had been receiving fertility treatments.

On her date of hire, Ms. Eichelberger received the Sinclair employee handbook

("Employee Handbook") and benefits package, which stated that Sinclair employees were

entitled to both short term disability ("STD") and long term disability ("LTD") benefits.  See

Docket No. 44 Exhs. 3 and 4.  The Employee Handbook provided explicitly in a section titled

"Employment At Will" that "no employee will have any contract of employment with the

Company for any specified period of time or for any particular terms or conditions unless in

writing and approved by the EVP or CEO." [1]  Docket No. 44 Exh. 4.  In addition, the Employee

Handbook explained that she must complete a 90-day introductory period prior to becoming

eligible for employee benefits, including STD benefits.  Id.  This introductory period could be

extended up to 90 additional days based upon her performance.  Id.

On February 27, 2006, Paul Nesterovsky, Ms. Eichelberger's supervisor, presented her

with a Performance Improvement Agreement, which outlined various performance deficiencies

and granted her 90 days to improve.  After the 90 days had passed, Ms. Eichelberger's

probationary status was lifted and she became eligible for benefits on June 1, 2006.

In May 2006, Ms. Eichelberger first learned that she might be pregnant.  In early June

2006, she notified Mr. Nesterovsky that she was pregnant with triplets.  On June 15th, however,

Ms. Eichelberger learned that she was pregnant with quadruplets, rather than triplets.  She

updated Mr. Nesterovsky on June 16th, and she informed him that the multiple-birth pregnancy

would require her to go on bed rest well in advance of her due date.  In response to her inquiry

about the future status of her job, both Mr. Nesterovsky and Jamie Dembeck, Sinclair's Human

Resources Director, assured Ms. Eichelberger that she could return to her position following the

birth of her children.

Ms. Eichelberger continued to work at Sinclair until August 3, 2006, when she was

diagnosed with edema.  As a result, her physician ordered her to bed rest until her delivery date,

which she began on August 4th.  On August 9, 2006, Ms. Eichelberger applied for STD benefits

through Sun Life Financial ("Sun Life"), the administrator of Sinclair's self-insured STD plan.

In her application, Ms. Eichelberger listed as her qualifying disability a "pregnancy with

quadruplets which has caused edema."  Docket No. 42 Exh. 19.  By letter dated September 6,

---

[1] Ms. Eichelberger also signed an "Acknowledgment Form" which stated that her employment was "terminable at
will."  Docket No. 42 Exh. 4.

2006, Sun Life recommended that Sinclair deny Ms. Eichelberger's STD benefits claim under the policy's "pre-existing condition" exclusion, which applied to "conditions that were treated within 90 days prior to the date of coverage." Docket No. 42 Exh. 22. A "pre-existing condition" was defined as "any injury or sickness for which you either received medical treatment, service or advice or took prescription drugs or medicines during the 90 day period preceding your first day of coverage or the most recent employment date." Id. Because Ms. Eichelberger was not eligible for STD benefits until June 1, 2006, and her pregnancy had been confirmed by ultrasounds in May 2006, her pregnancy (and resultant edema) was considered a "pre-existing condition." Consequently, Sinclair denied Ms. Eichelberger's request for STD benefits.

On September 8, 2006, Sinclair terminated Ms. Eichelberger by letter, explaining that the decision was "[b]ased on the fact that you are unable to work for such an indefinite period of time and there is no leave of absence or benefit plan you are covered by." Docket No. 42 Exh. 25. She was encouraged to re-apply for a position at Sinclair if she were "released to return to work at some point in the future." Id.

Ms. Eichelberger gave birth to quadruplets on November 15, 2006, and she was medically cleared to return to work on December 28, 2006. Although she never re-applied to Sinclair, Ms. Eichelberger obtained a new position elsewhere on February 15, 2007.

II.     STANDARD OF REVIEW

Summary judgment will be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A material fact is one that may affect the outcome of the suit. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party carries the burden of showing that there is no genuine issue as to any material fact in the case. Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282,

1286 (4th Cir. 1987).  In determining whether the movant has met her burden, a court must view

the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the non-

moving party.  Anderson, 477 U.S. at 255.  Mere unsupported speculation, however, will not

defeat a summary judgment motion.  Felty v. Graves-Humphreys, Co., 818 F.2d 1126, 1128

(1987).

III.     ANALYSIS

A.       Misrepresentation: Intentional ("Fraud") and Negligent

Ms. Eichelberger brings two misrepresentation claims, based upon statements made by

Defendants Nesterovsky and Dembeck, that she could return to her position at Sinclair following

her pregnancy and could receive disability benefits.  See Second Amended Complaint ¶ 32.  An

intentional misrepresentation (or fraud) claim consists of five elements: (1) a false statement of

material fact; (2) made with knowledge of its falsity, or reckless indifference to the truth; (3) for

the purpose of defrauding the plaintiff; (4) that the plaintiff relied upon the statement, and had a

right to do so; and (5) the plaintiff suffered compensable injury.  Ellerin v. Fairfax Sav, F.S.B.,

337 Md. 216, 229 (1995).

A negligent misrepresentation claim consists of five related elements: (1) the defendant,

owing a duty of care to the plaintiff, negligently asserts a false statement; (2) intending that the

plaintiff will act upon the statement; (3) with knowledge that the plaintiff will probably rely on

the statement which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes

action in reliance upon the statement; and (5) the plaintiff suffers damages proximately caused

by the defendant's negligence.  Lloyd v. GMC, 397 Md. 108, 135-36 (2007).

Summary judgment must be granted on both counts, as Ms. Eichelberger has provided no

evidence that she justifiably relied upon the alleged misrepresentations.  First, it is well

established that "an employment contract of indefinite duration, that is, at-will, can be legally

terminated at the pleasure of either party at either time." Adler v. Am. Standard Corp., 830 F.2d

1303, 1305 (4th Cir. 1987).  Ms. Eichelberger could not, therefore, have justifiably relied upon

Mr. Nesterovsky and Ms. Dembeck's statements, because the promise that she would be rehired

was always subject to retraction.  See McNierney v. McGraw-Hill, Inc., 919 F. Supp. 853, 861

(D. Md. 1995) (determining that an at-will employee cannot reasonably rely on an employer's

statements and maintain a cause of action for intentional misrepresentation).  In addition, Ms.

Eichelberger cannot show that she actually relied upon the alleged misrepresentations.  Any

assurances that her job would be waiting for her when she was ready to return to work did not

affect her decision to leave the company.  Rather, her doctor ordered her to stop working once

she was diagnosed with edema and she had no choice but to leave her position at Sinclair.

Ms. Eichelberger asserts that she did rely upon these alleged misrepresentations because

these statements caused her "to forgo looking for another position."  Docket No. 44 at 34.

Accordingly, had she known in June 2006 that her job at Sinclair would not be waiting for her

following her pregnancy, she would have begun looking for another job that would start

immediately on December 29, 2006.  If she met with success, Ms. Eichelberger would not have

been unemployed between December 29, when she was medically cleared to resume work, and

February 15, 2007, when she began her new job.  Thus, her claim under this theory is for

approximately six weeks' lost wages.

Her claim fails for two reasons.  First, she offers no evidence to establish that she would have

been able to obtain a suitable job beginning immediately on December 29, 2006.  Her claim,

then, is based on speculation.  Moreover, Ms. Eichelberger, as mentioned, was an at-will

employee and was not entitled to rely on her supervisors' assurances of future employment.

Having failed to establish that she relied on these alleged misrepresentations, summary judgment

is hereby granted as to Ms. Eichelberger's intentional and negligent misrepresentation counts.

      B.      <u>Breach of Contract - Employment</u>

Ms. Eichelberger also asserts a claim for breach of an oral contract that she allegedly

formed with Mr. Nesterovsky and Ms. Dembeck, when they promised her "that she could return

to her position at Sinclair once she had recovered from her pregnancy."  Second Amended

Complaint ¶ 51.  She insists that this oral contract is valid and binding upon Sinclair, despite the

clear language of the Employee Handbook stating that any "separate employment agreement"

altering an employee's at-will status must be "in writing" and "approved by the EVP or CEO."

In Maryland, "an employer may avoid contractual liability by any terms which clearly

and conspicuously disclaim contractual intent." <u>Castiglione v. Johns Hopkins Hosp.</u>, 69 Md.

App. 325, 340 (1987).  The Employee Handbook could not be more clear that employment is

"at-will" except in the limited circumstance of a separate, written contract that is approved by a

high-ranking company officer.  Ms. Eichelberger expressly accepted these terms and signed an

Acknowledgement Form assenting to at-will employment.  Mere promissory language by her

supervisors does not establish the requisite intent to alter her at-will employment status through

an oral contract.  <u>See</u> <u>DeJong v. Gen. Electric Co.</u>, 1994 U.S. App. LEXIS 17255, at *4 (4th Cir.

July 14, 1994) (concluding that under Maryland law, "at-will employment must be contracted

away explicitly, or not at all"); <u>Suburban Hosp., Inc. v. Dwiggins</u>, 324 Md. 294, 303 (1991).

Moreover, Ms. Eichelberger did not offer adequate consideration for the alleged oral

contract. She claims that in exchange, she offered her promise to "remain employed at Sinclair

and [] not seek alternative employment."  Second Amended Complaint ¶ 53.  It has already been

established, however, that Ms. Eichelberger had no choice but to leave Sinclair after being

diagnosed with edema.  Nor has she identified any lost opportunities to accept employment

elsewhere during the three months she was able to work before going on bedrest.

Although her current salary is slightly less than her salary at Sinclair, she is not entitled to

collect the difference under a breach of contract theory.   Even if Sinclair had rehired her in

December 2006, the company would have been within its rights to terminate her at any point

after her date of rehire because she would have remained an at-will employee.[2]  Summary

judgment is, therefore, granted as to Ms. Eichelberger's first breach of contract claim.

C.      Breach of Contract – Denial of STD Benefits

Ms Eichelberger asserts a second breach of contract cause of action, in which she alleges

that Sinclair violated the terms of its disability policy by denying her claim for STD benefits.[3]

She takes the position that her edema, rather than her pregnancy, is the "disability" that qualified

her for STD benefits.  Because her edema did not develop until after her effective benefits date

of June 1, 2006, she was wrongly denied STD benefits based upon the "pre-existing condition"

exclusion.

In Maryland, insurance policies "are not in the first instance construed most strongly

against the insurer."  United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 495 (4th Cir. 1998).

Rather, an insurance contract is measured by its terms and the instrument is construed as a

whole.  Pacific Indem. Co. v. Interstate Fire & Cas. Co., 302 Md. 383, 388 (1985).  In reviewing

an insurance contract, the Court must first decide whether the terms of the contract are

---

[2] Pursuant to Maryland's "public policy" exception to the at-will employment doctrine, Ms. Eichelberger would be able to maintain certain causes of action, including discrimination under Title VII or abusive discharge, "when the motivation for the discharge contravenes some clear mandate of public policy."  See Insignia Residential Corp. v. Ashton, 359 Md. 560, 568 (2000); Adler, 291 Md. at 47.  In this case, however, Ms. Eichelberger has failed to make out a sufficient claim for discrimination under Title VII and has not asserted alternative causes of action falling under the Maryland "public policy" exception.  See infra Part C.

[3] As a "salary continuation plan," Sinclair's STD program is exempt from ERISA under the "payroll practices" exclusion.  29 C.F.R. § 2510.3-1(b).  See Greenwald v. Phillips-Van Heusen Corp., 1998 U.S. Dist. LEXIS 2449 (E.D. Pa. Feb. 24, 1998).  Accordingly, the claim is properly analyzed under a breach of contract framework.

ambiguous.  If the language is unambiguous, the Court may construe the contract as a matter of

law.  Id. at 389.  If, however, the language is susceptible to two meanings by a reasonably

prudent person, the parties may then introduce extrinsic evidence to determine the meaning of

the language at issue.  Id.  If the extrinsic evidence presents disputed factual issues, it is for a jury

to decide the meaning of the contract.  Id.

The policy defines "pre-existing condition" as "any injury or sickness for which you

either received medical treatment, service or advice or took prescription drugs or medicines

during the 90 day period preceding your first day of coverage or the most recent employment

date."  The policy explicitly defines "pregnancy" as a "pre-existing condition," stating that

"[p]regnancy will be treated as any other disability covered under the short-term disability

benefit for full-time employees."  See Docket 42 Exh. 22.  During the hearing, counsel for Ms.

Eichelberger stipulated that Ms. Eichelberger's pregnancy was a "pre-existing condition."  The

disputed issue, therefore, is over the definition of the "disability" for which Ms. Eichelberger

sought STD benefits.  Sinclair's position is that the edema was a symptom of her multiple-birth

pregnancy and, therefore, included within the definition of the "pre-existing condition," i.e.

pregnancy.  Ms. Eichelberger contends that her edema was a separate "complication" or

"secondary condition" arising from, but sufficiently attenuated from, the pregnancy itself.  Under

Ms. Eichelberger's interpretation, the edema cannot be considered a "pre-existing condition"

because it was diagnosed after the effective benefits date of June 1, 2006.

Sinclair essentially argues that "secondary conditions" are likewise excluded under its

"pre-existing condition" clause.  This interpretation is problematic because there is no express

language to that effect in the Sinclair STD plan.  Indeed, the wording of Sinclair's "pre-existing

condition" is, on its face, more inclusive than other "pre-existing condition" clauses reviewed in

the relevant case law.  Many insurance policies explicitly list "secondary conditions" in their

definition of "pre-existing conditions."  For instance, some plans explicitly exclude, along with

pre-existing conditions, "any disabilities caused by, contributed to by, or resulting from" a pre-

existing condition.  See Fought v. Unum Life Ins. Co. of Am., 379 F.3d 997, 999 (10th Cir.

2004); Holsey v. Unum Life Ins. Co. of Am., 944 F. Supp. 573, 578 (E.D. Mich. 1996).  Other

plans have also expressly stated that any "secondary conditions and complications" arising from

pre-existing conditions are likewise excluded.  See also Booth v. Wal-Mart Stores, Inc., 201 F.3d

335, 338 (4th Cir. 2000); Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 639 (8th Cir. 1997).

The language of Sinclair's STD plan, by contrast, does not mention "secondary

conditions and complications" within its definition of a "pre-existing condition."  Nevertheless, it

is difficult to presume from the absence of a "secondary conditions" clause that Sinclair actually

intended to cover injuries or illnesses directly attributable to the "pre-existing condition" of

pregnancy, while excluding treatment for the "pre-existing conditions" themselves.[4]

So far, neither side has retained a medical expert or offered medical evidence (aside from

selected treatment notes from Ms. Eichelberger's treating physician) bearing on the disputed

language.  The Court was hopeful that this dispute over the plan language could be resolved

without resort to expert medical testimony.  This hope has proven illusory, however, and medical

evidence is needed to aid in resolving the impasse.  It is possible that expert testimony

concerning pregnancy and its complications may clarify the plan language, making it possible for

---

[4] The Court notes that the Fourth Circuit addressed a related issue when it established a test for determining when a "pre-existing condition" will affect liability under an accident policy.  See Adkins v. Reliance Standard Life Ins. Co., 917 F.2d 794, 797 (4th Cir. 1990) (adopting the "substantially related" test and holding that a "mere 'relationship' of undetermined degree is not enough").  The Court later refined the Adkins test into a two-pronged inquiry: (1) whether there is a pre-existing disease, pre-disposition, or susceptibility to injury; and (2) if so, whether it "substantially contributed" to the disability or loss.  Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1028 (4th Cir. 1993).  It is not clear, based on the state of the record in this case, that the Court should apply a similar test to the context of an STD plan with a "pre-existing condition" exclusion that does not explicitly exclude secondary conditions.

the Court to interpret the policy without a trial.  If not, expert testimony will be of benefit to the

trier of fact.  Accordingly, the Court will reserve ruling on this issue until the parties have

developed and submitted expert testimony.  By separate Order, the Court will request that

counsel propose a schedule for presenting expert testimony.

>        D.      Title VII Employment Discrimination

In her Second Amended Complaint, Ms. Eichelberger brings a cause of action for

pregnancy discrimination under Title VII of the Civil Rights Act of 1964.  See 42 U.S.C. §

2000e(k).  Pregnancy discrimination is a form of sex discrimination and must be analyzed

pursuant to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973).  See DeJarnette v. Corning, Inc., 133 F.3d 293, 297 (4th Cir. 1998).

We assume, for purposes of summary judgment, that Ms. Eichelberger has established

her prima facie case of pregnancy discrimination.  In its Motion for Summary Judgment, Sinclair

has provided a legitimate, nondiscriminatory reason for her termination – namely, that Ms.

Eichelberger had exhausted her leave time.  Docket No. 42.  Ms. Eichelberger did not, however,

address her Title VII claims in her Response in Opposition to Defendants' Motion for Summary

Judgment, nor did her attorney raise these arguments during the hearing.  Docket No. 44.

Because Ms. Eichelberger has failed to satisfy her burden of producing evidence that Sinclair's

stated reason for her termination was merely pretextual, summary judgment is appropriate.

>        E.      Breach of Fiduciary Duty

Ms. Eichelberger's final cause of action sounds in breach of fiduciary duty, arising out of

Sinclair's denial of her claim for disability benefits.  This claim is deficient because there is no

independent tort for breach of fiduciary duty in Maryland.  See Swedish Civil Aviation Admin.

v. Project Mgmt. Enter., Inc., 190 F. Supp. 2d 785, 801 (D. Md. 2002) (explaining that, in certain

cases, a breach of fiduciary claim may be included within other causes of action, but it may not

stand alone as a separate tort). <u>See also</u> <u>Pusey v. Britt/Paulk Ins. Agency, Inc.</u>, 2008 U.S. Dist.

LEXIS 37525 (D. Md. May 6, 2008); <u>McGovern v. Deutsche Post Global Mail, Ltd.</u>, 2004 U.S.

Dist. LEXIS 15215 (D. Md. Aug.4, 2004).  As such, summary judgment is likewise granted as to

Ms. Eichelberger's breach of fiduciary duty claim.

IV.     CONCLUSION

        For the reasons stated herein, the Court hereby GRANTS, in part, Defendants' Motion for

Summary Judgment.  A separate Order follows.

        It is so ORDERED this 21st day of July, 2009.

                                              _____/s/_____
                                              Benson Everett Legg
                                              Chief Judge

11